IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MICHAEL S. HAFERMANN, | ) | |
| | ) | |
| Plaintiff, | ) | 4:12CV3204 |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | MEMORANDUM AND ORDER ON |
| Commissioner of the Social Security | ) | REVIEW OF THE FINAL DECISION |
| Administration, | ) | OF THE COMMISSIONER OF THE |
| | ) | SOCIAL SECURITY |
| Defendant. | ) | ADMINISTRATION |
| | ) | |

Michael S. Hafermann filed a complaint against the Commissioner of the
Social Security Administration[1] on September 26, 2012. (ECF No. 1.) Hafermann,
who is proceeding pro se, seeks a review of the Commissioner's decision to deny his
applications for disability insurance benefits under Title II of the Social Security Act
(the Act), 42 U.S.C. §§ 401 et seq., and for Supplemental Security Income (SSI)
benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. See 42 U.S.C. §§
405(g) and 1383(c)(3) (providing for judicial review of the Commissioner's final
decisions under Titles II and XVI). The Commissioner has filed an answer to the
complaint and a transcript of the administrative record. (See ECF Nos. 11-14.) In

---

[1] On February 14, 2013, Carolyn W. Colvin was appointed to serve as
Acting Commissioner of the Social Security Administration; shortly thereafter, she
was automatically substituted as a party in this case pursuant to Federal Rule of
Civil Procedure 25(d). (See Notice of Substitution, ECF No. 17.)

addition, the parties have filed briefs in support of their respective positions.  (See Pl.'s Br., ECF No. 16; Def.'s Br., ECF No. 26; Pl.'s Reply Br., ECF No. 30.)  I have carefully reviewed these materials, and I find that the Commissioner's decision must be affirmed.

## I.    BACKGROUND

Hafermann filed applications for disability insurance benefits and SSI benefits on February 6, 2009.  (Transcript of Social Security Proceedings (hereinafter "Tr.") at 221-231.)  The applications were denied on initial review, (id. at 113-114, 151-159), and on reconsideration, (id. at 116-117, 161-170).  Hafermann then requested a hearing before an ALJ.  (Id. at 172-173.)  The hearing was held on February 1, 2011, (e.g., id. at 64), and, in a decision dated February 24, 2011, the ALJ concluded that Hafermann "has not been under a disability, as defined in the Social Security Act, from June 1, 2008, through the date of this decision," (id. at 57 (citations omitted); see also id. at 47-58).  Hafermann requested that the Appeals Council of the Social Security Administration review the ALJ's decision.  (E.g., id. at 5-6.)  This request was denied, (see id. at 1-3), and therefore the ALJ's decision stands as the final decision of the Commissioner.

## II.    SUMMARY OF THE RECORD

On a Disability Report form, Hafermann claimed that he became disabled on January 1, 2002, due to heart disease with two stent placements, cellulitis, recurrent illness, chronic pain, dizziness, nausea, fever, chills, headaches, left leg swelling, left leg redness, a chronic infection of the left leg, chronic diarrhea, episodes of sweating, abdominal and groin pain, chest pain, left shoulder impingement, and arthritis.  (Tr.

2

at 266.)  He later amended his alleged onset date to June 1, 2008.  (E.g., id. at 68.)
He was 46 years old at the time of the hearing before the ALJ, and he has completed
"4 or more years of college."  (Id. at 68, 276.)  He has work experience as a bundle
hauler, forklift driver, laborer, lawn care worker, school bus driver, telemarketer,
telephone interviewer and temporary worker.  (Id. at 267, 281, 352-355.)

### A.    Medical Evidence

Before I summarize the evidence in the medical record, I must address two
preliminary matters.

First, my summary will emphasize the medical records cited by the parties in
their briefs.  Hafermann's briefs include lengthy descriptions of medical findings;
however, he provides few citations to the relevant pages of the transcript.  (See, e.g.,
Pl.'s Br. at 9, ECF No. 16 (arguing, without providing citations to the administrative
record, that the ALJ erred by failing to consider evidence of "episodes" that allegedly
occurred in March, June, September, and November 2004; January and October 2005;
September and November 2006; and January 2009).  See also, e.g., Pl.'s Reply Br. at
4-8, ECF No. 30.)  I shall make a diligent effort to identify the records that
correspond to Hafermann's arguments, but Hafermann must bear the risk that I will
be unable to locate the evidence upon which he relies.  Cf., e.g., King v. Astrue, 564
F.3d 978, 979 n.2 (8th Cir. 2009) (noting that the claimant has the burden of showing
that he or she is disabled through step four of the sequential analysis used to analyze
social security disability claims).

Second, the parties dispute whether records that predate the alleged onset date
are relevant.  Hafermann argues that medical records dating back to July 15, 1996,
must be considered.  (See Pl.'s Br. at 8, 11, ECF No. 16.)  The Commissioner
maintains that medical records predating Hafermann's alleged onset date (i.e., June

1, 2008) were considered in connection with Hafermann's past applications for benefits, but they are not relevant to the present case.  (See Def.'s Br. at 17, ECF No. 26.)  I will consider the records predating the alleged onset date "in combination with new evidence for the purpose of determining if the claimant has become disabled" since the denial of his most recent prior application.  Hillier v. Social Security Administration, 486 F.3d 359, 365 (8th Cir. 2007).  See also Pirtle v. Astrue, 479 F.3d 931, 934 (8th Cir. 2007) ("We have previously found that the ALJ may consider all evidence of record, including medical records and opinions dated prior to the alleged onset date, when there is no evidence of deterioration or progression of symptoms.").  I note, however, that the transcript includes no medical records dated prior to February 2005.  (See Tr. at 648-49, 652, 654.)  Records produced more recently do occasionally describe Hafermann's medical history, and these statements of medical history sometimes include references to medical events that predate 2005. (See, e.g., Tr. at 809 (consisting of a medical record dated July 8, 2010, that describes Hafermann's 2004 heart attack).)   I have taken note of these references to Hafermann's past medical history during my review of the record.[2]

---

[2] I note in passing that the fact that the transcript lacks documents dating back to 1996 does not amount to a failure to develop the record.  E.g., 42 U.S.C. § 423(d)(5)(B) ("In making any determination with respect to whether an individual is under a disability or continues to be under a disability, the Commissioner of Social Security shall consider all evidence available in such individual's case record, and shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability.").  Also, Hafermann has not submitted for my consideration any new, material evidence that was not included in the administrative record. See, e.g., Duncan v. Astrue, No. 11-555, 2012 WL 763566, at *26 (D. Minn. Feb. 14, 2012) (describing circumstances where a court may properly remand a claim for consideration of new evidence).

4

Kyle Haefele, M.D., examined Hafermann on February 10, 2006, and noted that he had been having issues with recurrent cellulitis. (Tr. at 672.) Hafermann's "white count" was found to be elevated during a previous check, so additional blood work was ordered. (Id. See also id. at 690-91.) Dr. Haefele diagnosed coronary artery disease, stable angina, hypercholesterolemia, and weight gain. (Id. at 672.)

On March 1, 2006, Hafermann visited the BryanLGH Heart Institute for a follow-up. (Tr. at 522.) It was noted that Hafermann "had stents placed in the ostial dominant circumflex in August 2004," and that he "had rather profoundly elevated LDL cholesterol and has been on 80 mg of Lipitor since." (Id.) Laboratory results obtained on February 17, 2006, showed that he was "doing about his baseline." (Id.) Hafermann was diagnosed with dyslipidemia and coronary artery disease, and he was instructed to continue with his medications, "make some therapeutic lifestyle changes," and return for a follow-up in one year. (Id.)

On April 6-7, 2006, Hafermann was admitted to the BryanLGH Medical Center's emergency room with complaints of chest discomfort. (E.g., Tr. at 627.) Hafermann's prior cardiac history was noted to include an "angioplasty/intracoronary stent placement to the circumflex coronary artery in August 2004" and a "normal Cardiolite Scan in January 2006." (Id.) An echocardiogram taken on April 6 showed a regular sinus rhythm with no acute ischemic changes, and cardiac enzymes were negative. (Id.) Also, chest x-rays revealed stable "heart and mediastinal silhouettes," normal vessels, and clear lungs. (Id.) The records state,

> On April 7, 2006, the patient underwent Cardiolite Stress Test which showed no evidence of ischemia or scar; left ventricular chamber size is normal without reversible cavity dilation; gated wall motions study shows wall motion in all segments with calculated injection fraction of 52%. He then underwent a CT angiogram of the chest which showed no evidence of pulmonary embolus; non-specific appearing lymph note left

5

hilum and questionably right hilum, need for further follow up or
assessment should be based on clinical grounds.
. . . .

Patient remained stable during the course of his hospitalization. He had
no further complaints of chest discomfort or shortness of breath. His
activity was increased as tolerated. Continuous cardiac monitoring
showed a regular sinus rhythm with no ectopy.

(Id. at 627-28. See also id. at 494, 635, 637, 641.) Hafermann was discharged with
"instructions regarding activity, discharge medications, and further follow up." (Id.
at 628.) His discharge diagnoses included atypical chest pain, arteriosclerotic heart
disease, hypertension, hyperlipidemia, chronic cellulitis, tobacco abuse, and "status
post appendectomy, left ankle surgery, and lymph node biopsy." (Id. at 627. See also
id. at 438-447.)

An endoscopic study conducted on April 21, 2006, revealed a normal
esophagus, "[e]rythematous erosions in the antrum compatible with erosive gastritis,"
and "[e]rythema in the duodenal bulb compatible with duodenitis." (Tr. at 435-36.)
It was noted that these "findings may have been contributing to [Hafermann's]
atypical chest pain." (Id. at 436.)

On April 28, 2006, Hafermann visited Robert Rauner, M.D., for a re-check of
his heart disease. (Tr. at 670.) Dr. Rauner noted that Hafermann had been admitted
to the hospital earlier that month for chest pain, but "his Cardiolite turned out okay
and his CT angiogram to rule out PE was also okay." (Id.) Dr. Rauner also noted that
Hafermann "had one episode of chest pain since his dismissal from the hospital and
was relieved with 1 nitroglycerin." (Id.) Hafermann reported that he was attempting
to walk at least 20 minutes per day and to stop smoking. (Id.) Dr. Rauner diagnosed
coronary artery disease, hypertension, hyperlipidemia, tobacco abuse, and possible

prediabetes; continued Hafermann's prescriptions; and advised him to return for a recheck in four months. (Id.)

Hafermann followed up with Tim Dalton, M.D., on August 25, 2006, regarding his chest pain. (Tr. at 670.) Dr. Dalton noted that Hafermann's depression, leg pain, and overall condition were stable, and "his lipids have been doing fine." (Id.) No changes were made to his medications, and he was directed to follow up in three or four months. (Id.)

On September 19, 2006, Hafermann visited the BryanLGH Medical Center emergency room with complaints of headache, fever, chills, and a left leg infection. (Tr. at 612, 614.) Hafermann reported that he has had "chronic flare-ups of cellulitis in the legs for over ten years," and his past flare-ups have been accompanied by similar symptoms. (Id. at 614.) An examination revealed an area of "only minimal" erythema around the left lower leg 10 centimeters by 10 centimeters in size. (Id.) There was no surrounding redness, no warmth, and no drainage. (Id.) In addition, there was a small area of erythema on the medial left knee. (Id.) The record states, "Neither one of these areas looked like they could be a source for his fever, but he states he has had similar symptoms in the past and has had fever with these minimal symptoms, and he does not want it to get worse." (Id.) Hafermann was treated with Keflex and advised to follow up with his primary care physician. (Id. See also id. at 621-23.)

On October 2, 2006, Hafermann followed up with Dr. Dalton regarding his cellulitis. (Tr. at 671.) Dr. Dalton noted that Hafermann had recently been seen in the emergency room with cellulitis of the left lower extremity, which was accompanied by headache, nausea, and "just feeling ill." (Id.) His symptoms "improved fairly quickly," and he was asymptomatic at the time of Dr. Dalton's

7

examination. (Id.) Hafermann denied night sweats, fatigue, decrease in appetite or weight, bowel problems, or lymphadenopathy. (Id.) A lymph node exam revealed "no palpable lymphadenopathy diffusely." (Id.) Hafermann's diagnoses included leukocytosis, resolved cellulitis, hyperlipidemia, coronary artery disease, history of stable angina, and tobacco dependence. (Id.) Lab tests were ordered, and Hafermann was advised to continue working on smoking cessation. (Id.)

On November 20, 2006, Hafermann followed up with Dr. Dalton regarding his cellulitis. (Tr. at 669.) Dr. Dalton noted that Hafermann was seen in the emergency room on November 13 with cellulitis of the left lower extremity and an elevated white blood cell count. (Id. See also id. at 593-610.) Hafermann reported "significant improvement in his discomfort and erythema," and mild or negative symptoms otherwise. (Id.) Dr. Dalton diagnosed leukocytosis and resolved cellulitis, and noted that Hafermann would be "set up with an hematologist if persistent with his recurrent infection and leukocytosis." (Id.)

On November 30, 2006, Hafermann visited Nathan Green, D.O., at the Southeast Nebraska Cancer Center on a referral from Dr. Dalton "for further evaluation of a mild leukocytosis." (Tr. at 450.) Dr. Green's evaluation states,

> Mr. Hafermann has an abnormal CBC with a mild leukocytosis associated with a normal differential. This comes in the clinical setting of a patient with recurrent lower extremity cellulitis and intermittent diffuse body aches. This patient also has a history of tobacco use. Differential diagnosis is certainly quite broad; however, I think it is most likely this represents a leukoid reaction secondary to chronic inflammation or occult infection. He certainly could have contribution from chronic tobacco use. Interestingly, his total white count has been declining toward normal over the last three months. I think it is much less likely that there is an underlying marrow disorder such as lymphoproliferative disorder. I have sent laboratory testing today . . . . I will plan to see Mike back in the office next week for the results of the

8

. . . studies.  At that point we will determine if a marrow exam is necessary.

(Id. at 452.)  A record dated December 6, 2006, indicates that all of the lab work ordered by Dr. Green was within normal limits, and there was no evidence of malignancy.  (Id. at 453.)

A three phase bone scan of Hafermann's lower extremities taken on December 4, 2006, was normal, and delayed whole body images revealed minimal degenerative uptake in Hafermann's left shoulder and cervical spine.  (Tr. at 592, 692.)

Hafermann visited the Bryan LGH Medical Center emergency room on December 25, 2006, with complaints of leg pain.  (Tr. at 570.)  He was suffering a fever, and an examination revealed groin tenderness, knee tenderness, and "a very small area of erythema at the knee."  (Id. at 573.)  He received medication in the emergency room and was discharged on December 26 with a prescription for Levaquin.  (E.g., id. at 588.)

Hafermann visited Richard Gustafson, M.D., on December 29, 2006, to follow-up after his December 25 emergency room visit for cellulitis of the left leg.  (Tr. at 668.)  Dr. Gustafson noted that Hafermann has "had repeated bouts of this over the last 10 years or so."  (Id.)  He also noted that Hafermann "[p]resented Christmas Day to E.R. with onset of pain, some redness around his ankle and knee and tenderness in the inguinal area, had a fever of 102, elevated white count with left shift."  (Id.)  He had been taking his medication, and the redness and pain in his leg was resolving at the time of Dr. Gustafson's examination.  (Id.)  Hafermann was directed to finish his course of medication and return if needed.  (Id.)

Hafermann returned to the BryanLGH Heart Institute for a follow-up on March 22, 2007.  (Tr. at 520.)  It was noted that he was doing well, and he was advised to

continue with his present medications and "lifestyle changes."  (Id.)

On September 17, 2007, Hafermann visited Dr. Dalton for a follow-up.  (Tr. at 667.)  Dr. Dalton noted that Hafermann had no recent bouts of cellulitis, but he had a chronically elevated white count, continued intermittent myalgias and leg pain, low back pain, mild reflux and epigastric pain, and chronic intermittent chest pain.  (Id.) Hafermann also complained of diarrhea over the past two to three weeks, "although it's not on a daily basis."  (Id.)  An examination revealed "some mild muscle tightness" in the back that mildly limited Hafermann's range of motion, and "no signs of recurrent cellulitis."  (Id.)  Dr. Dalton encouraged smoking cessation, exercise, and appropriate diet; ordered lab work; and instructed Hafermann to follow up "pending lab results, otherwise in 3-4 months."  (Id.)

Hafermann next visited Dr. Dalton on March 17, 2008.  (Tr. at 666.)  Dr. Dalton's record states,

> [Hafermann] has a hx of hypertension, hyperlipidemia, heart disease, tobacco dependence.  He also has some chronic pain issues as well as depression.  Things seem to be fairly stable from that standpoint although during complete ROS he has numerous somatic complaints although they are only mild and certainly not limiting him at this point. He continues to smoke ½ pack per day and we've talked at length many times about cessation.  He has not been very active over the winter months and is trying to get back into walking again.  He has gained some weight back.  He most recently had some URI symptoms but that seems to be improving.  He has no pulmonary or C/V symptoms.  He had some back pain with some spasm but that's improving as well.  He has continued intermittent diarrhea . . . .  Denies any other acute musculoskeletal complaints.

(Id.)  Following an examination, Dr. Dalton diagnosed hyperlipidemia under good control, hypertension borderline control, "CAD asymptomatic," tobacco abuse, "Depression fairly stable," and "Numerous somatic complaints."  (Id.)  Lab work was

ordered, Hafermann's medications were continued, and Hafermann was directed to follow up in four to six weeks.  (Id.)

On April 21, 2008, Hafermann followed up with Dr. Dalton, who noted, "Lab checked at last visit noted lipid panel to be in an ideal range other than his HDL is a little suppressed at 36." (Tr. at 665.)  Hafermann's white count remained elevated, and he had complaints of upper respiratory infection symptoms "for the past 5-6 days" and some intermittent diarrhea.  (Id.)  Dr. Dalton diagnosed "Hypertension controlled," "Hyperlipidemia fairly well controlled," "CAD stable," "Depression stable," and "URI improving."  (Id.)  He directed Hafermann to follow up in three months.  (Id.)

Hafermann followed up with Dr. Dalton again on July 28, 2008.  (Tr. at 664.)  He reported that his GI symptoms improved slightly, but he still suffered occasional diarrhea.  (Id.)  He also reported that he had been exercising regularly, and he was experiencing left shoulder pain, left elbow pain, and left heel pain.  (Id.)  Dr. Dalton diagnosed mild left shoulder impingement, left lateral epicondylitis, left plantar fasciitis, hypertension, coronary artery disease, and tobacco dependence.  (Id.)  He directed Hafermann to "[w]ork on stretching and strengthening exercises for the above musculoskeletal complains," "[w]ork on icing," and recheck in two to three weeks.  (Id.)  After completing four physical therapy sessions between September 8, 2008, and September 18, 2008, Hafermann reported that his only "main remaining problem [was] minimal pain in the heel," but this pain was continuing to improve. (Id. at 540.  See also id. at 534-39.)

On September 23, 2008, Hafermann visited the BryanLGH Medical Center and reported intermittent chest discomfort radiating down both arms and into his shoulders, along with sweating, nausea, and shortness of breath.  (Tr. at 543.)  It was

noted that he had a "history of a stent to his circumflex in 2004," and a "negative stress test in 2006." (Id.) Clyde Meckel, M.D., performed a cardiac catheterization on September 24, 2008, and discovered that Hafermann's "left anterior descending coronary artery ha[d] a severe 80% proximal stenosis just proximal to the origin of the first diagonal branch which ha[d] a 60% ostial stenosis." (Id. at 558.) Dr. Meckel then performed a "[s]uccessful stenting of the 80% proximal left anterior descending coronary artery lesion using two drug-eluting stents," which left "no residual stenosis," and a "[s]uccessful balloon angioplasty of the first diagonal side branch using kissing balloon technique," which left "30% residual stenosis." (Id. See also id. at 545.)

On October 6, 2008, Dr. Dalton noted that Hafermann had been hospitalized for chest pain on September 23, 2008, and treated by Dr. Meckel. (Tr. at 663.) Hafermann presented no complaints of continuing chest pain to Dr. Dalton, but he did complain of intermittent shoulder, back, elbow, hand, and foot pain. (Id.) He reported that physical therapy provided "significant relief" of these complaints, however. (Id.) Dr. Dalton diagnosed coronary artery disease status-post stent, hypertension, hyperlipidemia, multiple somatic complaints, and dental infection. (Id.) He prepared a note to excuse Hafermann "from work today," and he directed Hafermann to follow up in eight weeks. (Id.)

Hafermann visited the BryanLGH Heart Institute on October 17, 2008, and reported recurrent chest pain. (Id. at 518.) A treadmill nuclear perfusion study "came back normal." (Id. at 517; see also id. at 463, 518.)

Hafermann followed up with Dr. Dalton on November 17, 2008. (Tr. at 662.) Dr. Dalton noted that Hafermann had experienced some chest pain since his last visit, and he had completed a Cardiolite stress test. (Id.) He also noted that the test showed

an ejection fraction of 64% and "no obvious . . . abnormalities." (Id.)  Hafermann reported that a lower extremity infection "has been better," and he was curious whether the improvement might be attributed to the medication he had been taking to treat a dental infection.  (Id.)  Dr. Dalton spoke with Hafermann about his chest pain and noted that there "may be an anxiety component" to it.  (Id.)  He diagnosed atypical chest pain, coronary artery disease, controlled hypertension, controlled hyperlipidemia, tobacco dependence, depression, and anxiety, and he directed Hafermann to follow up in two or three months.  (Id.)

On January 12, 2009, Hafermann visited the BryanLGH Medical Center with concerns about recurrent cellulitis in his left lower leg.  (Tr. at 528.)  It was noted that Hafermann was last seen for this same issue on Christmas Day in 2006.  (Id.)  Hafermann was treated and discharged with a prescription for Levaquin and instructions to follow up with the Lancaster County Health Department.  (Id. at 529-33.)

On April 3, 2009, Glen Knosp, M.D., reviewed the medical records and completed a physical residual functional capacity assessment.  (Tr. at 716-24.)  He listed Hafermann's primary diagnosis as coronary artery disease, his secondary diagnosis as "atypical chest pain," and his "other alleged impairments" as a history of leukocytosis.  (Id. at 716.)   Dr. Knosp concluded that Hafermann could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, and sit for a total of about 6 hours in an 8-hour workday.  (Id. at 717.)  He also found that Hafermann had no postural, manipulative, visual, communicative, or environmental limitations.  (Id. at 718-20.)  Dr. Knosp wrote,

> Claimant is credible, however his infections do not meet the
> durational considerations.  He had stent/angioplasty but his remaining
> chest pain has been determined to be non cardiac/atypical.  Physical
> therapy has resolved his recent c/o left elbow/shoulder which came
> about when he started exercising aggressively.  He remains with left heel
> spur, which he also says has improved considerably.  Claimant has had
> condition which resolve [sic] quickly, although they are recurrent.

(Id. at 721.  See also id. at 723 (summarizing medical records).)

Also on April 3, 2009, Lee Branham, Ph.D., completed a psychiatric review technique form indicating that from January 1, 2002, through the date of the assessment, Hafermann had no medically determinable psychiatric impairment.  (Tr. at 702.)  Dr. Branham wrote,

> Claimant did not allege psych.  The disability file mentions the
> possibility only of a mental condition.  He has not seen a psych, has not
> been prescribed psych medications, and has never been hosp for psych.
> His ADL form presents his limitations as pertaining only to his physical
> medical problems.

(Id. at 714.)

On April 14, 2009, Hafermann visited BryanLGH Medical Center-East with complaints of left leg pain and redness.  (Tr. at 747, 749.)  Following an examination, it was noted that Hafermann appeared to be suffering from early cellulitis, though he was "nontoxic in appearance" and afebrile.  (Id. at 725, 748.)  He was prescribed oral antibiotics and directed to keep a previously-scheduled appointment with Lancaster County Health.  (Id. at 748, 750.)

Notes from Lancaster County Health dated April 17, 2009, indicate that Hafermann had been gradually feeling better since his ER visit on April 14.  (Tr. at 742.)  Hafermann sought a work note stating that he could only work 20 hours per week.  (Id.)  The doctor wrote a note to Hafermann's employer "for being absent this

14

week," but he "was not willing to write . . . a letter for 20 hrs pr work week" because he believed "client can work > hrs." (Id. See also id. at 741 (which includes a note from Arif A. Sattar, M.D., stating "Also, patient is asking [for] a note if we can give him that he can only work part-time, which according to him he was requesting by a caseworker. Patient is requesting that he can only work part-time based on his history of cellulitis. I told him that based on just the history of cellulitis we cannot write the letter that he can only work part-time.").) Hafermann was given a prescription for Lipitor and directed to follow up in one month. (Id. at 742.) The record indicates, however, that Hafermann refused to make a follow-up appointment and was "upset/swearing mad about not getting [a] work note." (Id. See also id. at 741 (indicating that Hafermann refused to stay in the clinic for a vital check because "Dr. Sattar upset him" and refused to follow up with a cardiologist because he was "sick of being misdiagnosed and being 'jerked around'").) Nevertheless, Hafermann returned to the clinic on May 8, 2009, for lab work and to pick up medications. (Id. at 741.)

On August 19, 2009, Jerry Reed, M.D., reviewed the medical record and affirmed Dr. Knosp's RFC assessment of April 3, 2009. (Tr. at 757-58.) Also on August 19, 2009, Patricia Newman, Ph.D., reviewed the record and affirmed Dr. Branham's mental RFC assessment. (Id. at 756.)

On September 21, 2009, Hafermann visited the Lincoln Orthopaedic Center with complaints of right foot pain. (Tr. at 759.) X-rays revealed a "small avulsion type fracture" of the fourth toe without displacement. (Id. at 760.) The toe was "buddy tape[d]" to the third toe, and Hafermann was advised to return if he continued to have problems. (Id.)

On November 12, 2009, Hafermann visited the BryanLGH Medical Center

Emergency Department with complaints of "discomfort with movement." (Tr. at 767.) Hafermann explained that he experienced the pain in his back, across his shoulders, down his arms, and "at the bottom of [his] lungs" whenever he moved. (Id.) His physician noted that Hafermann had previously "undergone percutaneous transluminal coronary intervention with two stents placed to an 80 percent proximal left anterior descending lesion using drug-eluting stents with no residual stenosis" and "successful balloon angioplasty of the first distal side branch . . . leaving 30 percent residual stenosis." (Id.) In addition to this, Hafermann reported that his history included "a repair and a screw in the left ankle in 1980 with removal . . . in 1998," and "an appendectomy and lymph node biopsy in 1978." (Id. at 769.) Hafermann said that the pain he was experiencing was "similar to his previous anginal pain . . . for which had stents placed." (Id. at 790.) He also complained of "easy fatigability," chronic cellulitis, arthritis, "muscle and joint pains," and chronic headaches, and he said he had "white blood cells diagnosis of possible cancer." (Id. at 769-70.) Hafermann's initial set of cardiac enzymes were normal and his EKG showed regular sinus rhythm with no acute ST to T wave changes; nevertheless, he was admitted to the Progressive Care Unit for further evaluation. (Id. at 767.) A transthoracic echocardiogram "showed normal left ventricular systolic function, normal diastolic function and mild pulmonary hypertension," and a "Lexiscan nuclear perfusion stress test" produced "a normal myocardial perfusion imaging study with no areas of ischemia or infarction identified." (Id. at 768.) Hafermann's physician concluded that "his discomfort was likely secondary to acid reflux," and "he was initiated on a proton pump inhibitor." (Id.) Hafermann was discharged home in stable condition on November 13, 2009. (Id.)

Hafermann was transported by ambulance to the emergency room at BryanLGH

Medical Center on July 8, 2010.  (E.g., Tr. at 816.)  He reported that he was in a basement doing exercise when he developed chest pain radiating into both arms.  (Id.)  He also reported that he has had two heart attacks, though records indicated "that he had a heart attack in 2004 but not when he presented with chest pain in 2008."  (Id. at 809.)  His past medical history was noted to include coronary artery disease, "non-ST elevation acute myocardial infarction in 2004, hypertension, hyperlipidemia, ongoing tobacco abuse, headaches, recurrent left lower extremity cellulitis, gastroesophageal reflux disease and mild pulmonary hypertension."  (Id. at 810.)  Examinations and tests revealed no ischemia, no infarction, and "normal left ventricular systolic function," but there was "decreased tracer uptake in the inferior wall, consistent with diaphragmatic attenuation artifact."  (Id. at 815.)  A comparison "to studies dated November 2009 and October 2008" revealed no significant changes.  (Id.)  Hafermann was discharged with instructions to follow up with a primary care physician in three to five days and obtain a routine cardiac evaluation in three months.  (Id. at 817.)

On July 15, 2010, Hafermann visited Jennifer Graham, P.A., for a post-hospitalization follow-up.  (Tr. at 827-28.)  He reported suffering chest pain on almost a daily basis, though it "does not last long."  (Id. at 827.)  Hafermann was referred to cardiology.  (Id. at 828.)

On November 2, 2010, Hafermann visited Dr. Meckel at the BryanLGH Heart Institute for an evaluation.  (Tr. at 832.)  Dr. Meckel wrote,

> Michael S. Hafermann has been fairly stable since he was in the emergency room in July and had a stress test that showed no evidence of ischemia.  He does have some occasional chest pain episodes that happen with exertion that have been very consistent over the last several years without clinical change.  There will be some radiation to his arms, but he has not had any severe chest pain episodes like he had in July.

> We have done multiple stress tests on him over the last several years and never found any evidence of ischemia for similar symptoms to this. He denies paroxysmal nocturnal dyspnea, orthopnea or ankle edema. Unfortunately, he does continue to smoke.

(Id.) Dr. Meckel diagnosed (1) chronic history of chest pain with some typical and atypical features, (2) negative nuclear study in July 2010, (3) coronary artery disease, status post left circumflex stenting in 2004 and left anterior descending coronary artery stenting in 2008 and also balloon angioplasty of a small diagonal side branch at that time, (4) ongoing tobacco abuse, (5) hyperlipidemia, and (6) hypertension. (Id.) Dr. Meckel "strongly encouraged" Hafermann to stop smoking and noted that a diagnostic coronary angioplasty could be considered if his chest pain symptoms accelerate. (Id.)

## B.   Hearing Testimony

During the hearing before the ALJ on February 1, 2011, Hafermann testified that he was working approximately 20 hours per week as a telephone interviewer. (Tr. at 69.) When asked how many hours he worked at a time, he responded, "Usually I schedule to work five hours this week. I'm only scheduled to work four hours a day. Just for four days this week . . . ." (Id. at 70.) He later clarified that he usually works four days per week for five hours per day. (Id. at 92.) Hafermann said that he earned "a B.A. from the University" in May 1986, and he attended law school for one semester. (Id.) He received government assistance and lives with his mother. (Id. at 70, 86.) When asked to describe "the most serious problem" that keeps him from working full-time, Hafermann stated,

> I would say it's a combination of at least two things. That'd be the recurring cellulitis, which is recurrent and chronic infections in my left leg, although I believe it's pretty much spread throughout my body, including my

18

> right side of my chest, the back of my head; and the heart
> disease.  I have high blood pressure, too.  . . . I also have
> arthritis in my left ankle; the same leg that I get the chronic
> cellulitis in. . . .  I also had a screw in that ankle that was
> placed there in 1980, in my left ankle.  That was placed
> there to repair a fracture that was supposed to be taken out
> at the time, but it never was.  That was removed in June
> 2000.

(Id. at 73.)  He described his head pain as being "always there," but "not a typical headache."  (Id. at 76.)  He also said, however, that the head pains "just kind of come and go," and can be exacerbated by certain medication.  (Id.)  In addition, Hafermann said that he suffers "normal headaches" that "will create pounding" approximately three times per week.  (Id. at 76-77.)  He also suffers constant pain in his left leg and right side.  (Id. at 82-84.)

Hafermann testified that he gets a feeling "like a hangover" or "flu-like feeling" that hinders his concentration, which he attributes this to his cellulitis.  (Id. at 77.)  Initially, he said that these feelings occur at least once per month and tend to be accompanied by diarrhea.  (Id. at 78-79.)  Later, however, he clarified that his pain also causes breaks in his concentration on a weekly–if not daily–basis.  (Id. at 92. See also id. at 93 (explaining that Hafermann experiences problems with concentration at least one day out of each workweek).)

Hafermann also testified that he is limiting to sitting for four or five hours in a day because he has to sit with his leg curled up underneath him in order to avoid throbbing in the back of his thigh.  (Id. at 80.)  He then has to alternate sitting and standing.  (Id. at 80-81.)  He added that prolonged standing caused worse pain than prolonged sitting, and he prefers not to stand for more than a few minutes.  (Id. at 89-90.)  He also said, however, that he usually walks every day for about 20 minutes.

(Id. at 91.)  Hafermann said that he cannot work more than part-time because his cellulitis and chest pain become aggravated when he increases his work.  (Id. at 86-87.)

Hafermann testified that he suffered heart attacks in August 2004 and September 2008, each of which resulted in the placement of stents.  (Id. at 88.)

Hafermann's mother also testified at the hearing.  (E.g., id. at 98.)  She stated that Hafermann has been living with her for eight years, and based on her observations she did not believe that he could maintain a full-time job.  (Id. at 98-99.)  She explained that Hafermann wears out extremely easily, and his chest pain and leg pain cause him problems.  (Id. at 100-101.)  She also said that she believed Hafermann would work full time if he could.  (Id. at 104-05.)

## C.    Vocational Expert's Testimony

During the hearing, the ALJ asked a Vocational Expert (VE) to consider an individual with Hafermann's "same age, education, and past work history," along with "any transferrable skills."  (Tr. at 108.)  The ALJ added that this individual "could lift up to 20 pounds on occasion, 10 pounds on a frequent basis; could, in an eight hour day, sit for six hours and stand for two hours; and would have an opportunity to alternate positions for short periods of time, perhaps hourly; he could, occasionally, bend, stoop, kneel, crawl; and he should not be around heights; should avoid hazards, such as open machinery; and should not be exposed to temperature extremes; should avoid concentrated cold, heat; and also, avoid things like dust, fumes, astringents."  (Id. at 109.)  He then asked the VE, "With those limitation[s], would he be able to do any of his past relevant work?"  (Id.)  The VE responded affirmatively, and specified that the hypothetical claimant would be able to work as a telephone solicitor.  (Id.)

The ALJ then asked the VE, "[I]f we were to treat his testimony as fully credible - - I think the most important of those was the fact that he can't work more than five hours per day, that'd take him out of competitive employment?" (Id. at 109-110.) The VE responded affirmatively. (Id. at 110.)

In response to questioning from Hafermann's counsel, the VE responded that Hafermann's concentration problems, headaches, flu-like symptoms, and chest pain are all symptoms mentioned in Hafermann's testimony that would preclude him from employment. (Id. at 110-111.)

### D.    The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. See 20 C.F.R. § 404.1520(a); id. § 416.920(a)  In this case, the ALJ proceeded to step four and found Hafermann to be not disabled. (See Tr. at 52-57.)

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b). The ALJ found that Hafermann "has not engaged in substantial gainful activity since June 1, 2008[,] the alleged onset date." (Tr. at 52 (citations omitted).)

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c); id. § 416.920(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's

21

ability to do "basic work activities" and satisfies the "duration requirement."  See 20
C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected
to result in death, it must have lasted or must be expected to last for a continuous
period of at least 12 months."); id. § 416.920(a)(4)(ii), (c); id. § 416.909.  Basic work
activities include "[p]hysical functions such as walking, standing, sitting, lifting,
pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing,
and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions";
"[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and
usual work situations"; and "[d]ealing with changes in a routine work setting."  20
C.F.R. § 404.1521(b); id. § 416.921(b).  If the claimant cannot prove such an
impairment, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. §
404.1520(a)(4)(ii), (c); id. § 416.920(a)(4)(ii), (c).  The ALJ found that Hafermann
"has the following severe impairments: a history of stent placement in 2004, coronary
artery disease, erosive gastritis, leukocytosis and recurrent leg cellulitis."  (Tr. at 52
(citations omitted).)

Step three requires the ALJ to compare the claimant's impairment or
impairments to a list of impairments.  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. §
416.920(a)(4)(iii); see also 20 C.F.R. Part 404, Subpart P, App'x 1.  If the claimant
has an impairment "that meets or equals one of [the] listings," the analysis ends and
the claimant is found to be "disabled."  See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id.
§ 416.920(a)(4)(iii).  If a claimant does not suffer from a listed impairment or its
equivalent, then the analysis proceeds to steps four and five.  See 20 C.F.R. §
404.1520(a); id. § 416.920(a).  The ALJ found that Hafermann "does not have an
impairment or combination of impairments that meets or medically equals one of the
listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (Tr. at 52 (citations

omitted).)

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[3] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." <u>See</u> 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f); <u>id.</u> § 416.920(a)(4)(iv), (e), (f).  If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.  <u>See</u> 20 C.F.R. § 404.1520(a)(4)(iv), (f); <u>id.</u> § 416.920(a)(4)(iv), (f).  The ALJ concluded that Hafermann "has the residual functional capacity to occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds.  The claimant can sit for up to 6 hours and stand and walk for up to 2 hours in an 8 hour workday but needs to alternate sitting and standing on an hourly basis and cannot work around heights and needs to avoid hazards such as open machinery.  He should not be exposed to temperature extremes, dust, fumes and astringents."  (Tr. at 52-53.)  The ALJ also found that Hafermann "is capable of performing past relevant work as a telephone solicitor," which "does not require the performance of work-related activities precluded by the claimant's residual functional capacity."  (<u>Id.</u> at 57 (citations omitted).)

### III.   STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings."

---

[3] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments."  <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).  <u>See also</u> 20 C.F.R. § 416.945(a).

Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)). See also Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted). See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." Id. (citations omitted). No deference is owed to the Commissioner's legal conclusions. See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003). See also Collins, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

24

# IV.   ANALYSIS

Hafermann's lengthy briefs recite dozens of arguments that, in Hafermann's view, warrant a remand.  (See generally Pl.'s Br., ECF No. 16; Pl.'s Reply Br., ECF No. 30.)  I have considered these arguments, and I find none of them to be persuasive.  Several of Hafermann's arguments are addressed below.

Hafermann argues first that the ALJ erred by failing to include "all of the impairments which the claimant/plaintiff has alleged throughout the disability determination process" in his step two findings.  (Pl.'s Br. at 2, ECF No. 16.)  More specifically, he states that the ALJ erred by failing to identify left ankle arthritis and hypertension as severe impairments.  (See id.  See also Pl.'s Reply Br. at 14-16, ECF No. 30.)  Hafermann also suggests that because a different ALJ who analyzed his prior applications found that his arthritis and hypertension were severe impairments, the ALJ who rendered the instant decision was bound by those findings.  (Pl.'s Br. at 2, ECF No. 16 (citing 20 C.F.R. §§ 404.955, 416.1455, 404.981, & 416.1481).)  I conclude, however, that the ALJ who rendered the instant decision was not bound to accept the findings of different ALJs who evaluated different applications that were submitted by Hafermann at different times.  Cf. Wilson v. Barnhart, 188 F. App'x 556, 557 (8th Cir. 2006).  Moreover, the record includes no documentary evidence or testimony indicating that Hafermann's hypertension or left ankle arthritis significantly limited his ability to do basic work activities since the alleged onset date.[4]

_____

[4] To the extent that Hafermann argues that the ALJ ignored Hafermann's claim that arthritis was a severe impairment, his argument is belied by the record.  (See Tr. at 53.)

Also, I note in passing that Hafermann seems to take issue with the ALJ's

Hafermann also argues that the ALJ erred by failing to list the September 2008 stent placements as severe impairments at step two. (Pl.'s Br. at 2, 10-11, ECF No. 16; Pl.'s Reply Br. at 13, ECF No. 30.)  The ALJ included Hafermann's history of stent placement in 2004, but not his history of stent placements in 2008, in his step two findings. (Tr. at 52.)  I agree that this omission is puzzling.  I note, however, that the ALJ did find at step two that Hafermann's coronary artery disease was a severe impairment, and the ALJ specifically mentioned the September 2008 stent placement and angioplasty during his discussion of the medical evidence. (See Tr. at 52, 55-56.)  Thus, I am not persuaded that the ALJ ignored or discredited evidence of Hafermann's 2008 stents.  The ALJ also noted, correctly, that Hafermann's "left ventricular function" was "quite good" following the September 2008 procedures.  Under the circumstances, I find that the ALJ's failure to include the 2008 stents in his step two findings is harmless.[5]

In his reply brief, Hafermann argues at length that the ALJ erred by failing to find that Hafermann suffered a second heart attack in September 2008. (Pl.'s Reply Br. at 9-14, ECF No. 30.  See also Pl.'s Br. at 10-11, ECF No. 16.)  The record establishes clearly, however, that although Hafermann did undergo stent placements and a balloon angioplasty in September 2008, he did not suffer a heart attack at that

---

failure to list plantar fasciitis, shoulder impingement, and tennis elbow as severe impairments.  (See Pl.'s Br. at 29-31, ECF No. 16.)  The record shows that these problems were addressed successfully after a few physical therapy sessions, and I am not persuaded that the ALJ erred by failing to incorporate them into his analysis at any step.

[5] Similarly, the ALJ's statement that Hafermann was seen by Dr. Whitney on November 2, 2010, when in fact he was seen by Dr. Meckel, is harmless error. (See Pl.'s Br. at 5, ECF No. 16; Tr. at 56, 832.)

time.  (E.g., Tr. at 809.)

Hafermann argues next that the ALJ erred by concluding that "[n]o infectious disease specialist has opined that this condition is disabling."  (Pl.'s Br. at 3, ECF No. 16.)  Hafermann states, "as far as [he] can recall," he did see an infectious disease specialist in "either November/December, 1997 or in October, 2001."  (Pl.'s Br. at 3-4, ECF No. 16.)  There are no records from an infectious disease specialist in the transcript, however.  Moreover, Hafermann admits that the infectious disease specialist who allegedly examined him in 1997 or 2001 "claimed that this condition was 'No big deal.'"  (Id. at 5.)  Thus, even if I were to credit Hafermann's allegation that he did see an infectious disease specialist, his allegation is not in tension with the ALJ's conclusion that Hafermann's cellulitis was not disabling.[6]

Hafermann argues that the ALJ erred by finding that Hafermann works four hours per day, five days per week, when in fact he usually works five hours per day, four days per week.  (Pl.'s Br. at 6, ECF No. 16; Tr. at 53.)  He also argues that the ALJ erred by finding that he attended law school for one year (when in fact he attended only one semester), and that "[m]edication has helped with depression."  (Pl.'s Br. at 6, 21, ECF No. 16; Tr. at 53.)  I agree with Hafermann that the ALJ's references to Hafermann's work schedule, law school career, and depression medication are inaccurate.  Nevertheless, because there is no indication that the ALJ's decision would be different if these errors had not occurred, I find that the errors are

---

[6] I note in passing that the ALJ also correctly observed that Hafermann's cellulitis responded favorably and quickly to conservative treatment, and Hafermann's treating physician refused to write a note stating that Hafermann could only work part time due to his cellulitis.  (See Tr. at 56-57, 741-42.)  The ALJ's finding that Hafermann could perform his past relevant work despite his cellulitis is supported by substantial evidence.

harmless.  See, e.g., Byes v. Astrue, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, Byes must provide some indication that the ALJ would have decided differently if the error had not occurred.").

Hafermann argues that the ALJ gave too much weight to Dr. Sattar's refusal to write a note stating that Hafermann could only work part time.  (Pl.'s Br. at 23-27, 39-40, ECF No. 16.)  I disagree.  Although the ALJ's summary of the medical evidence does refer to Dr. Sattar's unwillingness to write such a note, there is no indication that the ALJ treated this as a medical opinion entitled to controlling–or even substantial–weight.  (See Tr. at 56-57.)  Instead, the ALJ merely noted that the doctor was unwilling to write such a note.  This was not erroneous.

Citing 20 C.F.R. § 404.946 and 20 C.F.R. § 416.1446, Hafermann argues that the ALJ erred by failing to notify him of "anything that might be questionable and . . . might result in anything other than a wholly favorable decision."  (Pl.'s Br. at 15, ECF No. 16.)  By their terms, sections 404.946 and 416.1446 require the ALJ to notify a claimant "if evidence presented before or during the hearing causes the administrative law judge to question a fully favorable determination."  (Emphasis added).  Because Hafermann's claims were denied initially and on reconsideration, it cannot be said that the ALJ "question[ed] a fully favorable determination."  In short, Hafermann's reliance on sections 404.946 and 416.1446 is misplaced.

Hafermann also argues that the ALJ erred by failing to give reasons in support of his finding that the plaintiff was not disabled at step three.  (See Pl.'s Br. at 16-19, 20, 48-50, ECF No. 16 (citing, inter alia, Smith v. Heckler, 735 F.2d 312 (8th Cir. 1984)).  See also Pl.'s Reply Br. at 16-18, ECF No. 30.)  Notwithstanding Hafermann's arguments to the contrary, the record shows clearly that Hafermann did not meet or equal any of the listings, and under these circumstances the ALJ was

under no obligation to elaborate upon his conclusions at step three. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006). This case is readily distinguishable from Smith, 735 F.2d at 317-18, wherein (1) the ALJ erred by failing to find a severe impairment at step two, which led to a "consequent failure to evaluate [the claimant's] impairment according to the Listing of impairments," and (2) the record included evidence that the claimant met the requirements of a listing.

Hafermann criticizes the ALJ's finding that Hafermann is not credible "to the extent that he alleges disability and the inability to perform any and all work activity." (Pl.'s Br. at 27, ECF No. 16 (quoting Tr. at 57).) In particular, he argues that the ALJ erred by considering Hafermann's part time work as a basis for discrediting his testimony, (id. at 42-47), and by considering his pro se brief as evidence of his "mental" capabilities, (id. at 32, 42; Pl.'s Reply Br. at 19, ECF No. 30). He also argues that the ALJ erred by discrediting his complaints of right flank pain. (Pl.'s Reply Br. at 14, ECF No. 30.)

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (quoting Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001)). "In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the participating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Id. (citing, inter alia, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." Id. (citation omitted) (alteration in

original).  The ALJ need not explicitly discuss each of the foregoing factors, however.
Id. (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)).  "It is sufficient if
[the ALJ] acknowledges and considers [the] factors before discounting a claimant's
subjective complaints."  Id. (quoting Goff, 421 F.3d at 791) (alteration in original).
"If an ALJ explicitly discredits the claimant's testimony and gives good reason for
doing so," courts "will normally defer to the ALJ's credibility determination." Jones
v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010) (quoting Halverson v. Astrue, 600 F.3d
922, 932 (8th Cir. 2010)).

    In discrediting Hafermann's testimony, the ALJ first reviewed the objective
medical evidence pertaining to his allegations and concluded that it did not support
his claims.  (Tr. at 54-57.)  The ALJ also noted that Hafermann's treatments for his
cellulitis have been conservative, short, and successful, and no specialist has
indicated that cellulitis precludes Hafermann from all work.  (Id. at 57.)  Similarly,
the ALJ noted that Hafermann's cardiologist has opined that his condition is stable,
and there is evidence that gastritis has contributed to his chest pain.  In addition, the
ALJ observed that Hafermann was working part-time, that his writing ability
demonstrates that his "mental state" would permit him to perform his past relevant
work, and that the RFC assessment is "consistent with the findings of the State
Disability Determination Services."  (Id.)  I find that the ALJ provided several good
reasons for discrediting Hafermann's testimony, and therefore his conclusions are
entitled to deference.  More specifically, I find that (1) it was appropriate for the ALJ
to consider Hafermann's part time work when evaluating his credibility, e.g., 20
C.F.R. § 404.1571; 20 C.F.R. § 416.971; Douglas v. Barnhart, 130 F. App'x 57, 59
(8th Cir. 2005); (2) the ALJ did not err by noting that no physician has ever opined
that Hafermann was restricted from working, e.g., Young v. Apfel, 221 F.3d 1065,

1069 (8th Cir. 2000); and (3) the ALJ did not err by finding that Hafermann's writing exhibited "a mental state showing his capability mentally of performing his past relevant work," (Tr. at 58).[7]

Hafermann also argues that it is irrelevant that he lives with his mother and receives food stamps; that the ALJ improperly considered this evidence as part of a "veiled attempt at some sort of 'Motivational assessment'"; and that the ALJ erred by discrediting his mother's testimony based on her "pecuniary interest." (Pl.'s Br. at 28-29, 34-37, 47, ECF No. 16 (citing, inter alia, Smith v. Heckler, 735 F.2d 312, 317 (8th Cir. 1984)).)  In support of his arguments, Hafermann relies on the Eighth Circuit's statement in Smith that the Commissioner's decision must be reversed and remanded if the ALJ fails to make credibility determinations about the subjective testimony of family members.  735 F.3d at 317.  Here, however, the ALJ did make a specific determination that Hafermann's mother was not credible "for many of the same reasons" that undermined Hafermann's credibility.  (Tr. at 57.)  The ALJ also noted, appropriately, that Hafermann's mother "clearly has a pecuniary interest in the outcome of the case." (Tr. at 57.)  See Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006).  In short, the ALJ assessed the mother's credibility in accordance with

---

[7] Hafermann argues that the ALJ's consideration of his written brief as evidence of his mental capability to work is inconsistent with Reinhart v. Secretary of Health and Human Services, 733 F.2d 571, 573 (8th Cir. 1984), and Smith v. Heckler, 735 F.2d 312, 318-19 (8th Cir. 1984), which state that an ALJ cannot reject a claimant's subjective complaints solely on the basis of personal observations made during the hearing.  (See Pl.'s Br. at 42, ECF No. 16.)  Here, however, the ALJ did not reject Hafermann's subjective complaints based solely on his observation about the quality of the pro se brief Hafermann submitted following the hearing.  Furthermore, it seems to me that Hafermann's writing does tend to undermine his testimony that his pain causes him to suffer significant difficulties in concentration.

Smith v. Heckler and provided good reasons for discounting her testimony.

Finally, Hafermann argues that the ALJ's RFC findings–particularly those pertaining to Hafermann's ability to lift and to sit–are not supported by substantial evidence; that the ALJ made "no mention of the testimony" of the VE; and that the ALJ failed to include all of Hafermann's impairments in his hypothetical question to the VE. (Pl.'s Br. at 22-23, 33, 47, ECF No. 16; Pl.'s Reply Br. at 9, 21, 24-25, ECF No. 30.)   I disagree.   The ALJ determined Hafermann's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians, and the testimony of the witnesses (insofar as their testimony was deemed credible). McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).   See also 20 C.F.R. § 404.1545; id. § 416.945.   I find that the particular limitations specified by the ALJ are supported by substantial evidence.   Furthermore, the ALJ's hypothetical question included all of the limitations that were identified by the ALJ in his RFC assessment, and therefore the VE's testimony constitutes substantial evidence in support of the Commissioner's decision.   See Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005) ("A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'"). I find that the ALJ's failure to specifically discuss the VE's testimony is harmless under the circumstances presented here.

**IT IS ORDERED** that the Commissioner of Social Security's decision is affirmed.

Dated August 20, 2013.

BY THE COURT

_Warren K. Urbom_

Warren K. Urbom
United States Senior District Judge

32